Julius B. GRAHAM, Plaintiff,

v.

JACKSONVILLE COACH COMPANY and Jacksonville Transportation Authority, Defendants.

Civ. A. No. 81–999–CIV–J–M.

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 22, 1983.

 

13. In light of this ruling, the Court denies Hartford's motion to enjoin Hop-On from prosecuting the New Jersey action.

Harrel T. Buggs, Jacksonville, Fla., for plaintiff.

Michael J. Dewberry, and K. Alexandra Krueger, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

Plaintiff Julius B. Graham brought this action against defendants Jacksonville Coach Company ("JCC") and Jacksonville Transportation Authority ("JTA") after he was discharged from his employment allegedly because of his race in violation of 42 U.S.C. §§ 1981, 1983 (1976), and 42 U.S.C. § 2000e–2(a) (1976). Plaintiff seeks, *inter alia,* an award of back pay with interest, costs, attorney's fees and reinstatement to his former position. A nonjury trial of this action was held on February 22–23, 1983. After reviewing the record herein, and after hearing argument by counsel for the respective parties, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff, a black citizen of the United States, was employed by defendant JCC as a bus driver from March 1973 until June 9, 1980. Plaintiff was one of seventeen drivers hired by JCC in 1973. At all times material to the issues in this case, plaintiff was a member of the Amalgamated Transit Union Local No. 1197 ("Union"), which had a collective bargaining agreement with JCC.

2. Defendant JCC is a corporation licensed to do business in the state of Florida, and defendant JTA is an independent state agency of the state of Florida authorized to operate the mass transit system in the city of Jacksonville, Florida, of which plaintiff was a motor bus operator.

3. At all times material to the issues in this case, JCC used a system for recording accidents or incidents involving the operation of its bus fleet. The initial notification of an accident is given to a dispatcher over the radio by the bus driver, giving the location of the accident and the description of any damage or injuries. The dispatcher then calls an investigator who proceeds to the scene of the accident. The driver will subsequently complete an accident report and forward it to the Superintendent of Transportation. After the facts concerning the accident are collected from sources such as the investigator's report and the police officer's report, the accident is coded either preventable or nonpreventable. At this point, the Superintendent of Transportation prepares a 1506 form and codes the accident as either preventable or nonpreventable, a coding which is reflected on the form itself, along with a notation of whatever discipline is administered. A copy of the form is kept in the driver's personnel file. In addition to the individual 1506 forms for the driver's

accidents, each driver has an accident record card that summarizes the date of each accident of the driver, with information concerning the type of accident, whether it was coded preventable or nonpreventable, and the discipline administered. A driver has the right under the collective bargaining agreement to challenge the coding of an accident as preventable through the contractual grievance mechanism.

4. JCC has established a set of rules for the safe operation of the bus system, which is compiled in an employee handbook. JCC's employee handbook defines a preventable accident as

> [a]ny accident involving a company vehicle which results in property damage and/or personal injury, regardless of who was injured, what property was damaged, to what extent, or where it occurred, in which the employee in question failed to exercise *every* possible precaution to prevent the accident.

Defendants' Exhibit No. 20 at 21–22 (emphasis in original).

5. JCC also has a rule, contained in the employee handbook, regarding rear-end collisions. This rule provides that

> [o]perators must maintain a safe braking distance behind the vehicle in front of the bus. *There is no excuse for a collision with the vehicle ahead.*

*Id.* at 16 (emphasis in original). With regard to brakes, the employee handbook contains a rule that "[o]perators must test brakes before leaving the [p]roperty, as this will prevent many serious accidents. [An operator] must be familiar with the mechanical limitations of [his] bus and drive within these limits." *Id.* at 13–14.

6. The safe operation of the buses is JCC's primary goal. During the last fifteen years, JCC has been either first or second, in cities of comparable size, for safe operation of buses. It has won the National Safety Council Award for the last six years in a row.

7. During his employment with JCC, plaintiff had nine preventable accidents, five of which were rear-end collisions.

8. After the eighth preventable accident, which occurred on April 9, 1979, John Johnston, the Superintendent of Transportation, decided to terminate plaintiff's employment because of his poor driving record. At that point, plaintiff had had eight preventable accidents in six years, including four rear-end collisions. When Johnston brought plaintiff in to inform him of the termination, however, plaintiff pleaded with Johnston not to discharge him and described some personal problems he was having with his wife and children. As a result of plaintiff's pleas, Johnston relented and agreed not to terminate plaintiff's employment. Plaintiff, however, was placed on 120-days probation, during which time any accident that was coded preventable would result in his discharge; further, Johnston told plaintiff that if he ever had another rear-end collision, he would not be able to help plaintiff.

9. Although he had a right to do so under the provisions of the collective bargaining agreement, plaintiff never filed a grievance challenging the coding or level of discipline rendered as a result of any of his first eight preventable accidents.

10. On May 7, 1980, plaintiff had his ninth preventable accident and fifth rear-end collision. Before any coding or disciplinary action was taken by JCC on this accident, the Union went on strike. The strike began on May 12, 1980, and extended through May 23, 1980. Plaintiff worked during the period from Monday, May 26, 1980, through Friday, May 30, 1980, and then went on a one-week vacation, returning to work Monday morning, June 9, 1980.

11. Article X of the collective bargaining agreement between the Union and JCC provides:

> No employee shall be called upon to account for any offense against the rules of the Company later than ten (10) days after the alleged offense has been made known to the officers of the Company and disciplinary action must be taken within the next succeeding ten (10) days, except in the case of accidents when the Company shall have the election to defer determination of possible Disciplinary ac-

tion until after the settlement of any and all claims arising out of such accidents for a period not to exceed thirty (30) days. After the expiration of the time limits set forth above the penalty for such alleged offense shall be waived by the Company provided the alleged offender shall have been available during the time limits set forth above.

Defendants' Exhibit No. 21 at 11–12.

12. JCC followed a policy of not contacting drivers while they were on vacation. No attempt was made to locate and contact plaintiff while he was on vacation. Leo Hall, JCC's resident manager at the time in question, did not feel that plaintiff was available under the terms of article X during the eleven days the Union was on strike and during plaintiff's one-week vacation.

13. As a result of his discharge on June 9, 1980, plaintiff filed a formal grievance on June 11, 1980, pursuant to the collective bargaining agreement. According to plaintiff's statement in his grievance, he felt he was discriminated against because he knew of "no other driver being [dis]charged and/or terminated using accident data covering this length of time." Pursuant to the provisions of the collective bargaining agreement, the discipline and grievance were reviewed by Hall. On June 19, 1980, Hall, in a letter to Michael Graycar, the president of the Union, issued his decision denying the grievance. Finally, the matter was referred to Joseph Poquette, the president of JCC, who held a final appeals hearing in his office on July 3, 1980. Poquette rendered his decision on July 7, 1980, upholding plaintiff's discharge and the denial of the grievance.

14. Thereafter, the union membership voted to take plaintiff's grievance to arbitration pursuant to the provisions of the collective bargaining agreement. According to Graycar, the basis of the action taken by the union membership was that plaintiff had survived the 120-day probation entered as a result of the April 9, 1979, accident, and therefore should have received no discipline for the May 7, 1980, accident.

15. The Union and plaintiff retained present counsel to represent their interests in the arbitration. The initial arbitration hearing was held in Jacksonville on March 5, 1981. At this hearing, plaintiff and the Union asserted for the first time that plaintiff's discharge was improper because it was effected thirty-three days after his last accident, which they contended violated article X of the collective bargaining agreement.

16. The arbitrator issued his decision on June 19, 1981, concluding that the discharge of the plaintiff was for just cause due to his extremely poor driving record and that the Union and plaintiff had asserted the article X violation issue too late. Therefore, the discharge was sustained.

17. Plaintiff was not aware of the potential noncompliance by JCC with article X until after he retained counsel a few months after his discharge. Graycar, the Union president, overlooked the potential application of article X to plaintiff's case until it was brought up by plaintiff's counsel, even though Graycar was familiar with the provision and had a duty to enforce compliance with the collective bargaining agreement.

18. The article X issue was not included in the original written grievance; it was not raised in plaintiff's charge filed on October 6, 1980, with the Equal Employment Opportunity Commission. Moreover, this issue was not raised at any time during the prearbitration discussions between counsel for plaintiff and counsel for JCC. Graycar testified that the Union and plaintiff deliberately concealed the article X issue until the arbitration hearing so that they could "pull some Perry Mason sort of thing" on counsel for JCC.

19. Plaintiff is the only driver, black or white, who has been discharged more than thirty (30) days after his or her last accident.

20. A rear-end collision is not a common type of accident for a bus driver. Many drivers with long tenure have never had a rear-end collision. For example, Wiley Chesser, between 1967 and 1983, had only one preventable accident and no rear-end collisions; E. Washington, a black driver,

between 1965 and 1980, had only four preventable accidents and no rear-end collisions.

21. Plaintiff had the worst driving record of any driver hired in 1973 and still working for JCC at the time of plaintiff's discharge. The two next worst drivers, who both had seven preventable accidents, each had only one rear-end collision. No driver hired in 1973 had more than two rear-end collisions and nine of the seventeen drivers had no rear-end collisions. Moreover, seven drivers hired in 1973 had no more than one preventable accident.

22. Immediately after plaintiff's discharge on June 9, 1980, JCC hired seven new drivers—five of whom were black.

23. Black bus drivers have comprised approximately 50% of the total driving force at JCC in recent years. In 1980, JCC employed nine more black drivers than white drivers; at the time of the trial, JCC employed twenty-nine more black drivers than white drivers.

24. Since 1967, fourteen drivers have been placed out of service (discharged or resigned facing discharge) because of their poor driving records. Nine of these were white and five were black.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4) (1976).

2. In order to prevail under Title VII of the Civil Rights Act of 1964, Pub.L. No. 92–261, 86 Stat. 103 (codified as amended in scattered sections of 42 U.S.C.) ("Title VII"), plaintiff must show by a preponderance of the evidence that his discharge was based on his race. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In disparate treatment cases such as this, the ultimate factual inquiry is "whether the defendant intentionally discriminated against the plaintiff." *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

3. The same element of discriminatory intent must also be shown under 42 U.S.C. §§ 1981, 1983 (1976). *See, e.g., Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980). Moreover, such intent may be inferred in the same manner it is inferred under Title VII. *Id.*

4. A review of the record clearly indicates that plaintiff has failed to sustain his burden of proving that his discharge was based on any racial animus.

5. As a common carrier, JCC has the duty of exercising the highest standard of care for the safety of its passengers. *Edwards v. Jacksonville Coach Co.,* 88 So.2d 543 (Fla.1956).

6. Plaintiff was terminated for his poor driving record—nine preventable accidents, five of which were rear-end collisions. In light of plaintiff's poor driving record, and JCC's duty to care for the public's safety, JCC could have terminated plaintiff at any time within the thirty days after May 7, 1980; therefore, even if JCC technically failed to comply with the collective bargaining agreement in discharging plaintiff on day thirty-three, this action fails to prove that plaintiff's discharge was based on racial animus. There was no evidence that JCC deliberately delayed discharging plaintiff for three days because he was black, or that similarly-situated white drivers who claimed a violation of the article X 30-day provision had been reinstated. Plaintiff seeks to convert nothing more than a claim for noncompliance with the collective bargaining agreement, which claim has been resolved against plaintiff in arbitration, into a claim of racial discrimination. Plaintiff's evidence actually demonstrated that he was treated more favorably than all other drivers who had ever been terminated because he is the only one who was retained more than thirty days after his last accident.

7. JCC produced evidence articulating the nondiscriminatory reasons for the timing of the discharge. During the thirty-day period, the Union was on strike for twelve days, the first strike in twenty years, which

disrupted normal operations. JCC was not aware that June 9, 1980, was the thirty-third day after plaintiff's last accident. JCC's awareness of the article X provision in general is not the same as an intentional discriminatory violation of it. JCC's evidence concerning lack of awareness of the alleged violation was supported by plaintiff's witness, Graycar, who was convinced Hall and Johnston were not aware of the article X violation. Plaintiff himself was not aware of it until he retained counsel months after his termination. Graycar overlooked the potential application of article X to plaintiff's grievance until it was brought up by plaintiff's counsel. All the evidence on the parties' awareness of the article X provision supports Graycar's initial analysis that it was simply a technicality, and later, a potentially clever stratagem.

■ 8. Even if the evidence demonstrated that JCC knew the thirty days had expired, and was wrong in believing it could discharge plaintiff on day thirty-three, this would not mean that plaintiff's discharge was racially motivated. The fact that JCC may have been "wrong" about its nondiscriminatory reason is irrelevant if JCC's decision was not in fact based on a racial animus. *See Jones v. Orleans Parish School Board,* 679 F.2d 32, 38 (5th Cir.), *aff'd on rehearing,* 688 F.2d 342 (5th Cir.1982).

■ 9. Plaintiff offered his own testimony for the purpose of proving JCC's intent to discriminate against him on the basis of race. Plaintiff's testimony challenged JCC's failure to provide plaintiff with legal defense counsel in traffic court, to investigate plaintiff's accidents as thoroughly as plaintiff would have liked, and to code two of his five rear-end collisions non-preventable based on brake failure. The Court notes that no timely charge of discrimination or any grievance under the collective bargaining agreement was filed concerning this treatment. Moreover, this evidence is insufficient to sustain plaintiff's burden of proving discriminatory intent in either the discharge or the timing of the discharge.

10. Plaintiff's evidence concerning the alleged discriminatory intent of JCC was refuted by JCC's evidence concerning the proportion of blacks in the driver's force, the hiring of additional black drivers immediately after plaintiff's discharge, the fact that since 1967 a greater proportion of white drivers has been discharged based on their driving records, and the detailed analysis of all drivers' records which reflects no disparate treatment based on race.

11. Plaintiff also offered a civil rights compliance review report issued by the Urban Mass Transit Administration ("UMTA"), which in February 1981 tentatively concluded that JCC and JTA were in "probable noncompliance" with its affirmative action responsibilities in certain areas of personnel policies. Although the UMTA report is arguably admissible evidence, whatever little evidentiary value may be accorded such report does not help sustain plaintiff's burden of persuasion that his discharge was based on racially discriminatory reasons. The conclusory nature of the report, which is based in part on hearsay statements of unidentified employees, a short perusal of four discharged drivers' files, and the writer's subjective viewpoints, undermines its evidentiary value. The writer's conclusion that black drivers' files are more "heavily documented" than white drivers' files is refuted by the detailed analysis of the driving records of all drivers since 1970 and the fact that more white drivers have been discharged for poor driving records than have black drivers.

12. Based on the foregoing, the Court finds and concludes that plaintiff has failed to prove by a preponderance of the evidence that his discharge was based on a racial animus. Because plaintiff has failed to sustain his burden of proof on this issue, the Court need not reach the question of whether defendants' asserted statute-of-limitations defense bars plaintiff from recovering under 42 U.S.C. §§ 1981, 1983 (1976).[1]

Final Judgment in accordance with these findings of fact and conclusions of law will

---

1. Similarly, the Court need not reach the questions raised by defendant JTA of whether JTA was plaintiff's employer or whether JTA is a proper party to plaintiff's Title VII claim.

be entered in favor of defendants JCC and JTA.